UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| CATHY H. BRADFORD, | ) | Civil Action No.: 4:08-cv-2085-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CONBRACO INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This is an employment case.  Plaintiff alleges causes of action for gender discrimination, retaliation and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.  Presently before the Court is Defendant's Motion for Summary Judgment  (Document # 31).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

Defendant manufactures water gauges, safety and relief valves, gauge cocks, air cocks and other valves for the heating and cooling industry. Plaintiff began working for Defendant in July of 1990 in its customer service department. Plaintiff Dep. 19-21.  Plaintiff stayed in this position for approximately 6 months, when she was transferred to the production control clerk position in the production control department.  Plaintiff Dep. 19-21.  Plaintiff continued to work in this position

until January 2007. Plaintiff Dep. 19-21, 149.

In mid-January 2007, Plaintiff was notified by Defendant that her position, Rachel Outlaw's position and Cynthia Farr's position were being eliminated and they would be let go. Plaintiff Dep. 28-30. However, Plaintiff was informed that Defendant wished to interview all three of them for a newly created calibration lab clerk position. Plaintiff Dep. 30-34.

The calibration lab clerk's responsibilities include utilizing various computer programs, communicating with customers and otherwise providing excellent customer service, and maintaining records and materials in the calibration lab. Calibration Lab Clerk Job Description (attached as Ex. 3 to Kirchin Dec.). Given these job responsibilities, an individual must possess the following skills/knowledge to successfully work as a calibration lab clerk: (I) strong English and math skills, (ii) proficiency in a Windows operating environment, (iii) intermediate skills using Office applications (word processor, spreadsheets and databases), (iv) the ability to learn Gauge Insight database software, and (v) basic business administration skills. Calibration Lab Clerk Job Description.

All three of the individuals were interviewed the same day that they were let go. Plaintiff Dep. 30-34. Plaintiff interviewed with Richard Jacob, the calibration lab manager, who stressed that the position required sufficient computer skills, including proficiency in Microsoft Word and Excel programs. Plaintiff Dep. 34-39, Jacob Dec. ¶ 11. During the interview, Plaintiff informed Jacob that she had sufficient computer skills for the job he was describing to her, and she further stated that she was trainable. Plaintiff Dep. 34-39; Jacob Dec. ¶ 11. Based upon Plaintiff's representations, Jacob recommended that Defendant hire Plaintiff as a calibration lab clerk. Jacob Dec. ¶ 12; Cellemme Dec. ¶ 12. Ray Cellamme, Director of Engineering and Quality Assurance, approved the

recommendation.  Jacob Dec. ¶ 12;  Cellemme Dec. ¶ 12.  As Director of Engineering and Quality Assurance, Cellemme possessed final decision-making authority for the hiring or firing of individuals working in the calibration lab.  Cellemme Dec. ¶ 4.  Later that same day, Plaintiff was informed by Steve Kirchin, Human Resources Manager, that she received the job and the other two individuals were dismissed, and he informed her of her benefits, pay, hours, and that she was under a 60 day probationary period. Plaintiff Dep. 40-41, 45-48; Jacob Dec. ¶ 12; Cellemme Dec. ¶ 12; Kirchin Dec. ¶ 20.

Defendant maintains a probationary period policy applicable to at-will employees.  The policy states that "[t]he first 60 days of your employment is the orientation period.  During your 60 day orientation period you will be evaluated and the decision to retain you as an employee at will, to extend your orientation another 30 days or to terminate employment will be made."  Employee Handbook p. 11 (attached as Ex. 1 to Kirchin Aff.).  Another section of the employee handbook states the probationary period policy also applies to existing employees who are promoted or transferred to a new position.  Employee Handbook p. 13.

Plaintiff commenced her employment as the calibration lab clerk on January 17, 2007.  She received the same rate of pay and benefits that she previously received as a production clerk.  Kirchin Dec. ¶ 20; Plaintiff Dep. 46, 48.  Jacob served as Plaintiff's immediate supervisor.  Jacob Dec. ¶ 3; Plaintiff Dep. 50.  On or about the following day, Cellemme came by the calibration lab and informed Jacob, in front of Plaintiff, that if she needed any additional training there was funding available. Plaintiff Dep. 41-43.  Cellemme came by a few weeks later and again told Jacob, in front of Plaintiff, that if she needed any training they would send her. Plaintiff Dep. 41-43.

Plaintiff was the only female in the lab and worked with a number of other male individuals.

Plaintiff Dep. 50-51. Plaintiff asserts she was subjected to a myriad of inappropriate comments:

- In one instance, Jacob stated to Glenn Sims, in front of Plaintiff, "have you met my new girlfriend?" (Plaintiff's Dep., pp. 76-79).

- On or about the same time as the above comment was made, Jacob told Plaintiff, in the presence of Sims, to "step it up" when they were walking out the plant. (Plaintiff Dep., pp. 76-79, 103-104). This comment upset Plaintiff greatly, as she felt the comment meant she was slow and referenced her weight as a large woman. (Plaintiff Dep., pp. 103).

- On another occasion and in the presence of Plaintiff, Jacob actually removed his belt from his pants and put it around Rick Thigpen, a lab employee, and proceeded to state that Thigpen had "trimmed down." (Plaintiff Dep., pp. 101-102). Plaintiff felt like this comment, as well as other similar comments, were directed at her due to her weight. (Plaintiff Dep., pp. 101-103).

- Randy Horne was eating a apple in the presence of Jacob and Plaintiff. (Plaintiff Dep., pp. 102-103). Jacob told Horne that he was "glad to see you eating healthy" and that "we all need to eat healthy," which Plaintiff felt referred to her weight. (Plaintiff Dep., pp. 102-103).

- On another occasion, Rick Thigpen told Plaintiff that he was going through a divorce and his wife was having him followed, and he said "I'm not having sex with anyone but myself." (Plaintiff Dep., p. 97). Plaintiff told Thigpen that she did not want him talking to her like that. (Id.).

- On one occasion, Plaintiff had typed up a form for Jacob wherein she abbreviated the word "standard" by using the letters "std." (Plaintiff Dep., pp. 89-97). Jacob told Plaintiff that she should not abbreviate it that way because it looks like "sexually transmitted diseases." (Id.). Tom Croghan, who was present when this occurred, heard Jacob talk about "sexually transmitted diseases" and proceeded to tell Jacob and Plaintiff about an incident in the Philippines where he was exposed to "venereal disease." (Id.). Jacob responded to Croghan by saying "we can't be talking about cream-filled donuts; we have a lady present." (Id.). Plaintiff felt this comment made matters worse instead of calming the men down. (Id.).

- Jacob had numbered a form using "XXX" and was reviewing it with Plaintiff, when he informed her the "XXX" was a number and not a X-rated movie. (Plaintiff Dep., pp. 182).

- On another occasion, Jacob began discussing with Horne, in the presence of

-4-

Plaintiff, the problems he and his wife were having getting pregnant. (Plaintiff Dep., pp. 178-181). Jacob then asked if Horne and his wife would carry their baby and Horne said they would be their "incubator." (Id.).

- On one occasion, Jacob told the lab employees, including Plaintiff, that he had gone to a club the previous weekend. (Plaintiff Dep., pp. 98-101). Jacob went on to describe the club, stating that he got to "put women in cages" at the club. (Id.). Plaintiff told Jacob to not talk like that. (Id.).

- On yet another occasion, Brett Gale, a lab employee, was using a "Viagra" pen. (Plaintiff Dep., pp. 183-185). Gale told Plaintiff he had the pen so he would be "stiff". (Id.).

- On one occasion, Jacob approached Plaintiff after she answered a phone call with a customer. (Plaintiff Dep., pp. 172-177). In front of the other lab employees, Jacob got in her face and began to yell at her because he did not like the way she answered the call, which greatly upset Plaintiff. (Id.).

- Jacob had also told Plaintiff that the reason her computer skills were not as good as his was "because of her age." (Plaintiff Dep., pp. 156-158; Deposition of Richard Jacob [hereinafter "Jacob Dep."], pp. 58-59).

Plaintiff Response 3-4. Plaintiff asserts that she reported these comments to Debbie Emanuel, a former friend and a human resources assistant/receptionist, in a series of telephone conversations. Plaintiff Dep., pp. 68-76, 82-89, 105-117. Plaintiff's testified that her first call to Emanuel occurred at the end of January or beginning of February, wherein Plaintiff told Emanuel she was being mistreated and told her about the comments being made. Id. Emanuel, on the other hand, testified that Plaintiff called her on two occasions between January 2007 and March 2007. Emanuel Dep. 31-36. Specifically, Emanuel testified that Plaintiff first called her shortly after Plaintiff started in her new position as calibration lab clerk and complained that Jacob was smart and thought everyone ought to be as smart as him. Emanuel Dep. 34-35. Plaintiff also complained that she did not understand how to do some of the tasks she was required to do. Emanuel Dep. 35-36. Emanuel testified that Plaintiff did not voice any other concerns in this first conversation. Emanuel Dep. 35-

36. Emanuel testified that Plaintiff contacted her on only one other occasion before her termination, which was after her 60-day probationary review. The substance of that conversation is discussed below.

Defendant asserts that Plaintiff exhibited a number of performance problems from the outset of her employment as calibration lab clerk:

- On one occasion, Jacob provided Plaintiff with a sample document and asked her to create a form document for the calibration lab's use based upon the information contained in the sample. Plaintiff was unable to accomplish the task. Jacob Dec. ¶ 13; Cellemme Dec. ¶ 13.

- In a similar vein, Jacob asked Plaintiff to create a chart using the Microsoft Excel computer program so that certain calibration data could be systematically analyzed and tracked. Plaintiff was unable to do so despite representing in her job interview that she was proficient in using the Excel program. Jacob Dec. ¶ 13; Cellemme Dec. ¶ 13.

- In February 2007, Defendant's largest customer complained that Plaintiff acted in a rude and unprofessional manner when responding to the customer's inquiries. The customer was so upset that (I) one of the calibration lab technicians had to intervene and address the customer's concerns and (ii) following the customer's complaint, Jacob held a special meeting with the customer to ensure that the customer continued to do business with Defendant. Jacob Dec. ¶ 14; Plaintiff Dep. 126-27, 172-74; Cellemme Dec. ¶ 13; Gale Aff. ¶ 6; Elizondo Aff. ¶ 4.

- Plaintiff also wrongly billed customers for gauge calibrations not actually performed and for calibrations performed for other customers. The billing errors were embarrassing to Defendant and required extra effort and work to correct. Jacob Dec. ¶ 14.

In the beginning of February, Jacob met with Plaintiff to see how the job was going. Plaintiff Dep. 60-62. Plaintiff told him she would like to get more training regarding the operations of the lab and their "system," however her performance was never discussed during this meeting. Plaintiff Dep. 60-62.

On or about March 21, 2007, Jacob met with Plaintiff for her 60-day probationary review. Plaintiff Dep. 62-67, 121-129; Jacob Dec. ¶ 17; Kirchin Dec. ¶ 21; Cellemme Dec. ¶ 13. Jacob avers that he informed Plaintiff that her job performance was unsatisfactory because she lacked the requisite computer skills needed to successfully perform her job and did not demonstrate sufficient initiative to acquire the skills. Jacob Dec. ¶ 17; see also Kirchin Dec. ¶ 21; Cellemme Dec. ¶ 13. Jacob also stated that Plaintiff's customer service skills were deficient as evidenced by the February 2007 incident with the company's largest customer. Jacob Dec. ¶ 17; Kirchin Dec. ¶ 21; Cellemme Dec. ¶ 13; Plaintiff Dep. 62-67, 121-29. Plaintiff, however, testified that Jacob did not address her computer skills during the meeting. Plaintiff Dep. 62-67, 121-29. Jacob advised Plaintiff that Defendant was not terminating her employment but was extending her probationary period up to an additional 30 days. Jacob Dec. ¶ 17; Kirchin Dec. ¶ 21; Cellemme Dec. ¶ 13. Jacob avers that he made it abundantly clear to Plaintiff that her job performance needed to improve immediately and substantially, otherwise she could be terminated at any time during the extended probationary period. Jacob Dec. ¶ 17; see also Kirchin Dec. ¶ 21; Cellemme Dec. ¶ 13. Plaintiff testified that Jacob made it clear that he had already decided to terminate Plaintiff, stating she would not be working in the lab at the end of that time period. Plaintiff Dep. 62-67, 121-129.

On March 22, 2007[1], Plaintiff called Emanuel and stated that she overheard employees make sexual jokes about overweight women and that she thought the jokes were about her. Emanuel Dep. 33. Plaintiff did not identify who the employees were (other than "the guys in the lab") or provide

---

[1]Emanuel does not recall the actual day Plaintiff contacted her with her concerns. Emanuel Dep. 32. However, she does testify that she contacted Kirchin the same day she spoke with Plaintiff to advise Kirchin of Plaintiff's concerns. Emanuel Dep. 40. Kirchin avers that Emanuel contacted him about Plaintiff's concerns on March 22, 2007. Kirchin Dec. ¶ 22.

any other specifics. Emanuel Dep. 33, 39. Emanuel advised Plaintiff that she should contact her Human Resources Manager, Kirchin, about her allegations. Emanuel Dep. 39. Emanuel also contacted Kirchin and reported her conversation with Plaintiff. Emanuel Dep. 40-41; Kirchin Dec. ¶ 22. Kirchin advised Emanuel that he would handle the matter. Emanuel Dep. 40-41; Kirchin Dec. ¶ 22. Later that same day, Kirchin met with Jacob and asked if Plaintiff had raised any concerns with him during their March 21, 2007, meeting. Jacob advised him that she had not. Kirchin Dec. ¶ 23.

The following day, Kirchin showed up at the calibration lab and informed Jacob that he was "here to check on my girl." Plaintiff Dep. 68-76, 82-89, 105-117. Plaintiff met with Kirchin to discuss her concerns, including the inappropriate treatment and comments. Plaintiff Dep. 135-142. Kirchin took contemporaneous notes during the meeting. Kirchin Dec. ¶ 24; Kirchin Handwritten Notes (attached as Ex. 4 to Kirchin Dec.). Plaintiff explained that she disagreed with Jacob's assessment of her job performance and his management style. Plaintiff Dep. 137-41; Kirchin Dec. ¶ 25. She also informed Kirchin of the inappropriate comments and behavior that had been going on. Plaintiff Dep. 135-142; Kirchin Dec. ¶ 25. She did not claim that she was being sexually harassed or discriminated against because of her age or gender. Kirchin Dec. ¶ 25. Plaintiff asked if she could be transferred to another department, and she informed Kirchin that she never received the training she was told about. Plaintiff Dep. 135-142. Kirchin told her that there were no other positions available, nor would they send her to any training. Plaintiff Dep. 135-142. Plaintiff testified that after her meeting with Kirchin she did not overhear any inappropriate language in the calibration lab. Plaintiff. Dep. 147.

Following the March 21, 2007, meeting where Plaintiff's probationary period was extended, Plaintiff continued to exhibit the same performance problems she showed during the initial 60 day

probationary period. She also failed to exercise sufficient initiative to improve her performance. Jacob Dec. ¶ 18. Accordingly, Cellemme decided to terminate Plaintiff's employment. Jacob Dec. ¶ 18; Cellemme Dec. ¶ 14; Kirchin Dec. ¶ 27. On April 2, 2007, Jacob and Kirchin met with Plaintiff and advised that she was being terminated for unsatisfactory work performance. Jacob Dec. ¶ 19; Kirchin Dec. ¶ 28. Defendant did not hire anyone else to replace Plaintiff following her termination. Instead, Plaintiff's job duties were dispersed among existing employees. Kirchin Dec. ¶ 29; Cellemme Dec. ¶ 16; Jacob Dec. ¶ 20.

Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission on July 17, 2007. Def. Ex. 6 to Plaintiff Dep. She received her Notice of Right to Sue on April 16, 2008. Def. Ex. 7 to Plaintiff Dep. She filed the present action on June 2, 2008.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322. See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.   DISCUSSION

### A.    Gender and Age Discrimination

Plaintiff asserts that Defendant discriminated against her because of her gender in violation of Title VII of the Civil Rights Act of 1964 (Title VII) , 42 U.S.C. § 2000e, et seq. and because of her age  violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.

The burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[2] applies to claims pursuant to both Title VII and the ADEA. Under the analysis set forth in McDonnell Douglas, the plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002). In order to prove a prima facie case of discriminatory discharge, Plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for her position and her job performance was satisfactory; (3) she was terminated; and (4) other employees who are not members of Plaintiff's protected class were retained under apparently similar circumstances. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir 2004) (Title VII); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310-12 (1996) (ADEA). The fourth element can also be satisfied by showing other circumstances giving rise to a reasonable inference of unlawful discrimination. Id.

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the Plaintiff's discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a

---

[2]The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143.

It is undisputed that Plaintiff, as a female who was 47 years old at the time of her discharge, is a member of the protected classes established by Title VII and the ADEA and that she was terminated from employment with Defendant. Defendant argues that Plaintiff cannot show that her job performance was satisfactory or that her position was filled with someone outside her protected class (or classes) and, thus, fails to present a prima facie case of gender or age discrimination.

Jacob, Plaintiff's direct supervisor, and Cellamme, the Director of Engineering and Quality Assurance, who had final decisionmaking authority with respect to employees in the calibration lab, both aver that, within the first sixty days of her employment as calibration lab clerk, Plaintiff failed to exhibit proficiency in the computer skills she claimed to have during her interview. Defendant presents evidence that Plaintiff was unable to perform simple wordprocessing and spreadsheet tasks. Furthermore, an important customer complained of Plaintiff's rude and unprofessional behavior. Finally, Plaintiff made billing errors on more than one occasion.

Plaintiff does not dispute that she experienced problems carrying out her duties as calibration lab clerk. Rather, Plaintiff argues that from 1990 to January of 2007, she received outstanding performance reviews and was never written up or reprimanded. She further argues that her old supervisor, Tony Nussman, highly recommended her for the calibration lab clerk position. However, the relevant time period to assess Plaintiff's job performance is from January 2007, when she began her position as calibration lab clerk, to April 2007, when she was terminated from that position. See Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 518 (4th Cir. 2006) (holding that evidence of past work performance did not alter the "abundant evidence" showing that the plaintiff was not otherwise

meeting the employer's legitimate job expectations at the time of discharge). Furthermore, it is the

perception of the employer, not the employee's own self assessment, that is critical. Hawkins v.

Pepsico, 203 F.3d 274, 279 (4thCir.2000); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). Thus,

Plaintiff's belief that her job performance prior to beginning her position as calibration lab clerk was

satisfactory is insufficient to satisfy the prima case requirement.

Plaintiff also argues that she was trainable and that training was available but she was not

allowed to attend any training. However, Plaintiff admittedly informed Jacob during her interview

that she had sufficient computer skills for the position. Her subjective belief that Defendant should

have provided her with training is also insufficient to show that her job performance was satisfactory.

Defendant also argues that Plaintiff's prima facie case fails because Plaintiff cannot show that

her position was subsequently filled with someone outside her protected classes. The record reveals

that the calibration lab clerk position was not filled after Plaintiff was terminated. Instead, Plaintiff's

job responsibilities were dispersed among the other employees in the lab. Plaintiff points to Jenny

Stavrakas, "a younger female" who was subsequently hired for the position of Shipping and

Receiving Clerk. Jacob Dep. 42-44. However, Plaintiff admits that Stavrakas's job description was

different than hers. She argues only that Stavrakas performed some of the same duties. Furthermore,

there is no evidence in the record of Stavrakas's age to determine whether she was outside Plaintiff's

protected class. This is insufficient to show that her position was filled with someone outside her

protected class.[3]

Because Plaintiff presents insufficient evidence to establish a prima case of discrimination,

---

[3]The fourth element of the prima facie case can in limited circumstances satisfied by
showing other circumstances giving rise to a reasonable inference of unlawful discrimination.
However, Plaintiff fails to raise this argument.

summary judgment is appropriate on Plaintiff's claims of gender and age discrimination. However, assuming, arguendo, Plaintiff has established a prima case, Defendant presents a legitimate, non-discriminatory reason for Plaintiff's termination and Plaintiff fails to establish that reason is pretext.

Defendant presents evidence that, because Plaintiff started a new position as calibration lab clerk, she was placed on a 60 day probationary period. At the end of the probationary period, Jacob informed Plaintiff that her job performance was deficient but, rather than terminate her employment, Defendant was going to extend her probationary period, at most, 30 additional days to allow her the opportunity to improve her performance. Because her performance did not improve, Cellamme determined that her employment would be terminated. Unsatisfactory job performance is a legitimate, nondiscriminatory reason for termination.

In rather conclusory fashion, Plaintiff argues that Defendant's reason for her termination was pretext for a discriminatory reason. Plaintiff asserts that multiple comments made by various male employees in the calibration lab evidence gender discrimination. She also asserts that Jacob's comment that she lacked computer skills because of her age evidences age discrimination. She further asserts that she reported the comments before her 60-day review.

Importantly, the decision to terminate Plaintiff's employment was made by Cellamme, not Jacob nor any of the other employees in the calibration lab. Employers are not vicariously liable for the discriminatory acts and motivations of each person that they employ, even when such acts or motivations lead to or influence an adverse employment action. Rather, by defining "employer" to include "any agent" of the employer, Congress "evidence[d] an intent to place some limits on the acts of employees for which employers ... are to be held responsible." Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 287 (4th Cir.2004) ("an employer will be liable not for the

improperly motivated person who merely influences the decision, but for the person who in reality makes the decision.").

Also, Plaintiff does not dispute that her performance and skills did not meet her employer's expectations. To the extent she argues her report of the comments to Emanuel and Kirchin constitutes protected activity, her claim of retaliation is discussed below. The evidence presented by Plaintiff is insufficient to show the decision to terminate her employment was based on age or gender.

In sum, it is outside this Court's province to decide "whether the reason [for Plaintiff's termination] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir.2000) (quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir.1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer"). It is the perception of the employer that is critical. Hawkins, 203 F.3d at 280. Even a reasoned decision based on incorrect facts is not evidence of pretext. Pollard v. Rea Magnet Wire Co., 824 F.3d 557, 559 (7th Cir.1987).

For the reasons set forth above, Plaintiff fails to present sufficient evidence to create a genuine issue of material fact as to her claims of gender or sex discrimination. Accordingly,

summary judgment is appropriate on those claims.

**B.     Sexual Harassment/Hostile Work Environment**

Plaintiff also claims that she was subjected to a hostile work environment. Title VII makes it unlawful for an employer to discriminate against an employee with respect to compensation, terms, conditions or privileges of employment on the basis sex, which includes creating or allowing a hostile work environment based on sex. 42 U.S.C. § 2000e-2(a); EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 2009 WL 2152348 (4th Cir.2009). To prove a hostile work environment, the plaintiff must show that: (1) she was harassed because of her sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer. Gilliam v. South Carolina Department of Juvenile Justice, 474 F.3d 134, 142 (4th Cir.2007); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir.2003) (en banc).

First, Plaintiff must produce sufficient evidence to show that the conduct about which she complains is based upon her sex. Plaintiff "must show that 'but for' [her sex]... [she] would not have been the victim of the alleged discrimination." Gilliam, 474 F.3d at 142 (quoting Causey v. Ballog, 162 F.3d 795, 801 (4th Cir.1998)). The critical inquiry here is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Ocheltree, 335 F.3d at 331 (quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Plaintiff complains of several comments made in her presence that she feels were inappropriate. Several of the comments Plaintiff felt were directed at her weight, i.e., the comment from Jacob that she "step it up," a reference made by Jacob that a co-employee had "trimmed down,"

and Jacob's statement that "we all need to eat healthy." Even if these comments were directed at Plaintiff, they were not because of her sex. Plaintiff also complains that Jacob reprimanded her in front of several other employees and commented that she could not perform her computer duties because of her age. Likewise, these comments fail to amount to harassment because of sex.

The other comments about which Plaintiff complains–Jacob introducing Plaintiff as his girlfriend, Thigpen's comment that he was only having sex with himself, references to sexually transmitted diseases, XXX, and "cream-filled donuts," Jacob's comment about his and his wife's problems getting pregnant and Horne's comment that his wife could be their incubator, Jacob's comment that he got to "put women in cages" at a club, and Gale's reference to Viagra and being "stiff"–do have sexual overtones. Thus, Plaintiff has presented evidence that she was exposed to harassment based upon her sex.

Plaintiff must also show that the alleged harassing conduct was unwelcome. Plaintiff asserts that, on a few occasions, the told her coworkers making the offensive statements that they should not talk like that. Plaintiff also asserts that she contacted Emanuel on several occasions and complained about the sexual jokes that were being made. Plaintiff also spoke to Kirchin about her concerns with the inappropriate comments. Plaintiff has presented sufficient evidence that at least some of the conduct about which she complains was unwelcome.

Plaintiff must next present evidence that the harassment was sufficiently severe or pervasive to create an abusive working environment. Plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)). Actionable harassment

occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21. Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U. S. 75, 80 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008). "[C]omplaints premised on nothing more than rude treatment by co-workers, callous behavior by supervisors, or a routine difference of opinion and personality conflict with one's supervisors are not actionable under Title VII." Id.

The Fourth Circuit has utilized a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir. 2000).

Here, the incidents about which Plaintiff complains describe, at most, a "limited number of incidents that are more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." Racicot v. Wal-Mart Stores, Inc., 414 F.3d 675, 678 (7th Cir. 2005). Plaintiff testified in her deposition that the behavior in the calibration lab reminded her of her physically and emotionally abusive ex-husband. Plaintiff Dep. 198-201. She also testified that she would occasionally throw up or cry before going into work. Plaintiff Dep. 198-199. Importantly, however, the conduct must be both objectively and subjectively offensive. Faragher, 524 U.S. at 787. Furthermore, the incidents must be more than mere offensive utterances–they must create an atmosphere that is "permeated" with ridicule and insult. Harris, 510 U.S. at 21. While the

comments made in Plaintiff's presence may have been offensive and uncouth, they are not sufficiently severe or pervasive to create an abusive working environment. As the Fourth Circuit has observed, "Title VII is not a federal guarantee of refinement and sophistication in the workplace." Hartsell v. Duplex Products, 123 F.3d 766, 773 (4th Cir. 1997); Ocheltree, 335 F.3d at 333. Accordingly, Plaintiff's sex harassment/hostile working environment claim is without merit and summary judgment is appropriate.

**C.     Retaliation**

The McDonnell Douglas burden-shifting analysis also applies to claims of retaliation. To establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him (including actions that a reasonable employee would have found to be materially adverse in that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination), and (3) a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Mgmt, Inc., 259 F.3d 261, 271 (4th Cir. 2001); Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Again, it is undisputed that Plaintiff suffered an adverse employment action when she was terminated. However, Defendant argues that Plaintiff did not engage in protected activity, but, even if she did, she cannot establish a causal connection between any protected activity and her termination.

A plaintiff may engage in protected activity under either the "opposition" clause or the "participation" clause of § 2000e-3. "To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim." Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir.1998). However, a plaintiff must show she opposed an

unlawful employment practice which she reasonably believed had occurred or was occurring. See Peters v. Jenney, 327 F.3d 307, 320 (4th Cir.2003). "The inquiry is therefore (1) whether [plaintiff] 'subjectively (that is, in good faith) believed' that the [defendant] had engaged in [an illegal practice], and (2) whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer to as one of 'reasonable belief.' " Peters v. Jenney, 327 F.3d 307, 321 (4th Cir.2003) (citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir.2002)). See also Jordan v. Alternative Resources Corp., 458 F.3d 332, 338-40 (4th Cir.2006).

Plaintiff asserts that she opposed unlawful employment activity when she reported the inappropriate conduct of her male coworkers to Emanuel and then again to Kirchin. Defendant argues that the actions about which Plaintiff complains do not rise to the level of actionable harassment and, thus, her complaints were not objectively reasonable in light of the facts. Furthermore, Defendant argues that the "suspicious timing" of Plaintiff's complaint, that is, after her 60-day probationary review, makes it questionable as to whether Plaintiff raised the complaints in good faith.

The undersigned is not persuaded that Plaintiff's complaints were not made in good faith because of the time during which they were raised. Although it is undisputed that Plaintiff did not assert any complaints of harassment to Kirchin until after her 60 day probationary review, a question of fact exists as to when Plaintiff first complained of the sexual comments to Emanuel. Plaintiff maintains that she first complained to Emanuel prior to her 60 day probationary review, while Emanuel testified that it was after. Nevertheless, as already discussed above, Plaintiff's complaints of harassment are not objectively reasonable in light of the facts. Therefore, Plaintiff fails to show that she engaged in protected activity.

Because Plaintiff has failed to show she engaged in protected activity, summary judgment is appropriate on Plaintiff's claim of retaliation. However, assuming, arguendo, Plaintiff did engage in

protected activity when she reported her concerns about the behavior in the calibration lab to Kirchin, a causal connection exists between that activity and her termination. Plaintiff complained to Kirchin on March 23, 2007. She was terminated on April 2, 2007. A causal connection can be established based on temporal proximity alone, that is, where the employer takes adverse employment action against an employee shortly after learning of the protected activity. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989). The undersigned finds that a span of ten days between Plaintiff's complaints to Kirchin and her subsequent termination is sufficiently close to establish a causal connection for purposes of Rule 56. Thus, should the district judge determine that Plaintiff engaged in protected activity, then Plaintiff establishes a prima facie case of discrimination and the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for Plaintiff's termination.

As discussed above, Defendant asserts that it terminated Plaintiff's employment for her continued poor job performance. There is no dispute in the record that her job performance was unsatisfactory, and the that the performance problems raised with Plaintiff prior to her complaints to Kirchin. Ironically, Plaintiff asserts that Jacob told her on March 21, 2007, prior to her meeting with Kirchin, that it had already been decided that she would not be working in the calibration lab after the end of the 30 day extension of her probationary period. This, of course, negates any causal connection. No reasonable juror could conclude that Defendant concocted its reason for terminating Plaintiff's employment and the that the true reason was retaliatory in nature. Because Plaintiff fails to present sufficient evidence that Defendant's reason for her termination was pretext for a retaliatory reason, summary judgment is appropriate on this claim as well.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary

Judgment (Document # 31) be granted and this case be dismissed in its entirety.

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 12, 2010
Florence, South Carolina